IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

VINCENT JOHNSON,

    Petitioner,

  v.

WARDEN, CHILLICOTHE
CORRECTIONAL INSTITUTION,

    Respondent.

CASE NO 2:15-CV-00971
Judge James L. Graham
Magistrate Judge Elizabeth P. Deavers

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition*, Respondent's *Return of Writ*, Petitioner's *Reply, Motions to Supplement*, and *Supplemental Memorandum* (ECF No. 10-14), and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

### Facts and Procedural History

Petitioner was convicted after a jury trial in the Franklin County Court of Common Pleas on two counts of rape, one count of attempted rape, one count of kidnapping, one count of abduction, and one count of domestic violence, with specifications. (*See* ECF No. 9-1, PageID# 68.) The state appellate court summarized the facts and procedural history of the case as follows:

> Appellant's convictions pertain to an incident that occurred on January 5, 2013 at the home appellant shared with his girlfriend, F.C., and their child K.J. The following factual summary is taken from the evidence adduced at appellant's jury trial.
>
> FC testified that she met appellant when she was 17 years old , and their relationship proceeded beyond friendship after she turned 18.

The two began living together shortly after they started dating and F.C. became pregnant; however, during her pregnancy, their relationship ended.  Their child, K.J., was born on June 7, 2002, and appellant was incarcerated at that time.  Appellant remained incarcerated until March 2010 and, at that time, appellant began living with FC. and K.J.

Regarding the events of January 5, 2013, F.C. testified that she, appellant, K.J., and appellant's nephew were at their apartment at approximately 7:30 or 8:00 p.m. when appellant received a telephone call from his brother, W.J.  At some point in the conversation, WJ told appellant that he had sex with F.C.  According to F.C., appellant "got very angry" and began "yelling, screaming [and] questinging."  (Tr. 91.)  F.C. initially denied the allegations, but eventually admitted to appellant that she and W.J. did have an affair.  F.C. testified that after her admission, appellant punched her along her cheek which caused her to fall.  Appellant then proceeded to kick, hit, and spit on F.C. and also called her names and screamed at her.  Thereafter, appellant grabbed F.C. "by the fistfuls of hair" and dragged her down the stairs to the basement.  (Tr. 93.)

Once in the basement, appellant continued to kick, hit, and spit on F.C. and then proceeded to urinate on her.  F.C. testified that "[h]e said he was going to pee on me like the dog that I was."  (Tr. 95.)  While in the basement, appellant forced F.C. to a couch and attempted anal intercourse.  When the attempt failed, appellant pulled F.C. over and performed vaginal intercourse.  Though repeatedly telling him to stop, F.C. testified that appellant would scream at her such things as "[s]hut up, bitch," and "[i]s this how my brother likes it?"  (Tr. 99.)  After ejaculating and telling F.C. that he hoped she "got pregnant," appellant went upstairs and left F.C. in a bathroom in the basement.  (Tr. 100.)

Utilizing appellant's cell phone that he had previously thrown on the basement floor, F.C. sent a text message to appellant's sister, asking her to call 911.  After appellant returned to the basement, he instructed F.C. to go upstairs and get "cleaned up."  (Tr. 104.)  Appellant then forced F.C. to the bedroom.  F.C. sat on the floor while appellant called various people and told them F.C. had slept with W.J.  F.C. testified:

> At one point, he made me sit on the bed and talk to his cousin and admit to his cousin that I had slept with his brother, and he proceeded to hit me while on the phone, talking to his cousin.  When he got

2

> off of the phone with his cousin, he grabbed my head again and started, like, fistfuls of hair on either side and banging my head against the bed, sitting right on top of me.

F.C. also testified that, while in the bedroom, appellant forced her to perform oral sex on him. According to F.C., "[h]e told me that if I didn't, that it really didn't matter anymore, that it was pretty much over, that I was going to do this." (Tr. 109.) F.C. testified that she "told him to please stop" and "[t]hink about what you're doing." (Tr. 109.) Afterwards, appellant took some money from F.C's pants' pocket and left the house. F.C. testified, "I was nervous, and I was shaking. I hit the "Talk" button. It started ringing, and it was his cousin." (Tr. 110.) F.C. testified that they had a "conversation" and then she called 911. Appellant returned as F.C. was still on the line with the 911 dispatcher. F.C testified that upon his return, appellant appeared "a lot calmer" and informed F.C. that he "couldn't let anybody see [her] look like this." (Tr. 137.) After police arrived, appellant was placed in handcuffs, and F.C. described the events, including the sexual assaults, in her statement to the officers. F.C.'s injuries were photographed, and F.C. went to the hospital where she underwent a sexual assault examination. F.C. testified that she did not see her child or nephew at any time during the incident and believes the two children remained upstairs in K.J.'s bedroom the entire time. On cross-examination, F.C. admitted that she had consensual sex with appellant within 96 hours of the alleged sexual assault, but was uncertain as to whether it was on Friday night or Saturday morning before the incident.

K.J., who was 11 years old at the time of trial, testified that, on January 5, 2013, appellant had been on the telephone and then told K.J. and his cousin to go upstairs to K.J.'s room. While in his room, K.J. heard a "loud thump" and heard F.C. "screaming" and appellant "yeling." (Tr. 183.) K.J. testified that he could only make out appellant saying "[s]top lying." (Tr. 183.) According to K.J., this went on for "[a]bout a couple hours" and that it "got quiet a little bit, and then it would start again." (Tr. 184.) K.J. testified that he left his room once to get his cousin a glass of water, but he did not see anything. K.J. also testified that he next saw F.C. "after it all – was all said and done," and she had "a big bruise under her eye and a couple bruises on her arms." (Tr. 186-7.)

Columbus Police Detective David Bobbitt testified he hasked F.C. whether she had any prior consensual sexual activity in the previous 96 hours because "the current standard is 96 hours on

3

how far out that DNA can remain in the system where consensual activity is relevant." (Tr. 219.) According to Detective Bobbitt's report, F.C. reported the last consensual activity with appellant was on "[t]he 4th of January, Friday afternoon." (Tr. 221.)

Dr. Patricia Robitaille was the physician who treated F.C. at Mount Carmel St. Ann's Emergency Department. During the external examination of F.C., Dr. Robitaille observed that F.C. "had multiple bruises on her entire left cheek, multiple bruises on her torso and all four extremities." (Tr. 280.) F.C.'s vaginal and anal examinations resulted in no remarkable findings, which, according to Dr. Robitaille, can be consistent with the history of alleged sexual assaults provided by F.C. Specifically, Dr. Robitaille testified "you can have unwanted intercourse, and you can have everything from not a scratch to the person being dead and everything in between, so, yes, you can have no apparent injury, no bruising, no lacerations, and still have had unwanted intercourse." (Tr. 282.) Dr. Robitaille also testified that F.C. reported consensual sexual activity occurred on the afternoon of January 4, 2013.

Testing of F.C.'s bra and shirt were positive for creatinine, a compound found in urine. Seminal fluid was identified in both F.C.'s vaginal samples and pubic hair standard. Additionally, trace amounts of seminal fluid were identified in FC.'s anal samples and pubic hair combings. The DNA profiles extracted from the vaginal and anal samples were consistent with FC and appellant. The DNA profile taken from FC's bra were consistent with both F.C. and appellant, while the DNA profile taken from F.C.'s shirt was consistent only with appellant.

When asked what things could impact the lab's ability to get positive results on the tests conducted in this case, Lindsay Main, forensic biologist at the Bureau of Criminal Identification and Investigation ("BCI"), testified, "[i]f the victim has showered, changed clothes, used the restroom, those all can inhibit or deplete the foreign DNA source." (Tr. 330.) Main also testified that the longer the time frame between an alleged sexual assault and when samples are taken can inhibit the chances of finding foreign DNA. Sarah Smith, DNA analyst at BCI, testified that she could not opine as to how the DNA got there as the "testing does not show a time frame or how anything appears." (Tr. 345.)

After the prosecution rested, appellant testified on his own behalf. According to appellant, he and F.C. engaged in consensual sexual relations in the afternoon prior to the incident. Appellant testified

4

that shortly thereafter, W.J. called and was upset with appellant because appellant told their sister that W.J. was not watching her son as he was supposed to be. Appellant testified that he hung up on W.J. and then W.J. began texting appellant. According to appellant, W.J. informed appellant through text messaging that he and F.C. had an affair. Appellant explained that he told the children to go upstairs and then he and F.C. proceeded to the basement to talk. Appellant denied grabbing F.C. or forcing her down the stairs. Appellant testified that, after F.C. admitted to having sex with W.J., appellant struck F.C. and then urinated on her to keep himself from hitting her again. Appellant testified:

> I pushed her. After I struck her, I urinated on her. I'm embarrassed. I'm ashamed. But I did it. I didn't want to hit her again. I was so hurt. I was angry, and I didn't want to touch her. And that's what I did. That's no excuse, that that's what I did.

(Tr. 372.)

According to appellant, after they left the basement, he called his two sisters and his cousin to tell them about the affair. F.C. then got cleaned up, and the two began talking in the bedroom. Appellant described himself as very calm at this time, and appellant testified that F.C. apologized for what she had done. Appellant also testified that he told F.C. the relationship was over and that he wanted custody of K.J. Appellant then took $15 from F.C's pants' pocket and left to get cigarettes. Shortly after he returned, the police arrived. Appellant denied telling F.C. to remove her clothes, denied attempting anal intercourse, denied forcing vaginal intercourse, and denied forcing F.C. to perform oral sex on him.

In a multi-count indictment rendered on March 11, 2013, appellant was indicted for two counts of rape, in violation of R.C. 2907.02, one count of attempted rape, in violation of R.C. 2923.02 as it relates to the R.C. 2907.02, two counts of kidnapping, in violation of RC. 2905.01, one count of robbery, in violation of R.C. 2911.02, one count of abduction, in violation of R.C. 2905.02, one count of domestic violence, in violation of R.C. 2919.25. Six of the indicted counts included a specification alleging appellant was a repeat violent offender ("RVO") based on his 2002 convictions for aggravated burglary and felonious assault. After deliberations, the jury returned a verdict of not guilty on one count of robbery and the lesser-included offense of theft, not guilty on one count of kidnapping, and guilty on all remaining charges. Thereafter, the

5

> trial court found guilty of the RVO specifications. A sentencing hearing was held, and appellant was sentenced to an aggregate prison term of 39 years with 227 days of jail-time credit.

(ECF No. 9-1, PageID# 68-73.) Through counsel, Petitioner raised the following assignments of error:

> [I.] Appellant was denied a fair trial by the introduction of inflammatory, emotional testimony.
>
> [II.] The judgment of the trial court is against the manifest weight of the evidence.
>
> [III.] The trial court committed plain error in imposing consecutive sentences without making the necessary findings in violation of RC 2929.14(C) (4).
>
> [IV.] The trial court committed plain error in imposing an aggregate sentence of thirty nine years that did not satisfy the principles set forth in R.C. 2929.11(B).

(PageID# 73.) Petitioner raised the following additional pro se assignments of error:

> [V.] The Trial Court abused its discretion allowing the D.N.A. to be entered as evidence in violation of Rules of Evidence 402 and 403(A), which violated Appellant's Fourteenth Amendment right to due process and to equal protection under the law.
>
> [VI.] Trial Court violated Appellant's Fifth Amendment Right to the Grand Jury when it amended the indictment under Rule 7(D).

(PageID# 74.) On June 17, 2014, the appellate court overruled Petitioner's first, second, fifth, and sixth assignments of error, and sustained his third assignment of error, rendering the fourth assignment of error moot, affirming in part and reversing in part the judgment of the trial court, and remanding the case for re-sentencing. (PageID# 84-85.) On July 22, 2014, the appellate court denied Petitioner's motion for reconsideration. (PageID# 240.) Petitioner filed a timely appeal with the Ohio Supreme Court. He asserted that the trial court abused its discretion by permitting DNA evidence and violated his right to a grand jury by amendment of the indictment.

(PageID# 246.)  On October 8, 2014, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B) (4).  (PageID# 255.)

On December 14, 2014, the trial court re-sentenced Petitioner to an aggregate term of 39 years incarceration  (PageID# 258-59.)  Petitioner filed a timely appeal (PageID# 261); however, he thereafter filed a motion to dismiss the appeal.  (PageID# 264.)  On March 18, 2015, the appellate court granted Petitioner's motion for voluntary dismissal of the appeal.  (PageID# 266.)

On March 19, 2015, Petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He asserts that the trial court abused its discretion by permitting admission of DNA evidence, in violation of Ohio evidentiary rules, his right to due process, and equal protection (claim one); and that he was denied his right to grand jury findings because the trial court improperly amended the indictment under Ohio Criminal Rule 7(D) (claim two).  It is the position of the Respondent that Petitioner's claims fail to provide a basis for relief.

## Standard of Review

Petitioner seeks habeas relief under 28 U.S.C. § 2254.  The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth standards governing this Court's review of state-court determinations. The United State Supreme Court recently described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, ––– U.S. ––––, ––––, 134 S.Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that statecourt decisions be given the benefit of the doubt." (internal quotation marks, citations, and footnote omitted)).

7

The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

"Under AEDPA, a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)); 28 U.S.C. § 2254(d)(1) (a petitioner must show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law"); 28 U.S.C. § 2254(d)(2) (a petitioner must show that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). The United States Court of Appeals for the Sixth Circuit explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

8

*Coley,* 706 F.3d at 748–49. The burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

"In order for a federal court to find a state court's application of [Supreme Court precedent] unreasonable, . . . [t]he state court's application must have been objectively unreasonable," not merely "incorrect or erroneous." *Wiggins v. Smith,* 539 U.S. 510, 520–21, (2003) (internal quotation marks omitted) (citing *Williams v. Taylor*, 529. U.S. at 409 and *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)); *see also Harrington v. Richter*, 562 U.S. at 102 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In considering a claim of "unreasonable application" under § 2254(d) (1), courts must focus on the reasonableness of the result, not on the reasonableness of the state court's analysis. *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) ("'[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence.'" (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*))); *see also Nicely v. Mills*, 521 F. App'x 398, 403 (6th Cir. 2013) (considering evidence in the state court record that was "not expressly considered by the state court in its opinion" to evaluate the reasonableness of state court's decision). Relatedly, in evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d)(1), a court must review the state court's decision based solely on the record that was before it at the time it rendered its decision. *Pinholster*, 563 U.S. at 181. Put simply, "review under § 2254(d)(1) focuses on what a state court knew and did." *Id*. at 182.

**Claim One**

In claim one, Petitioner asserts that he was denied a fair trial due to admission of DNA evidence against him in view of a stipulation that the alleged victim and the defendant had engaged in consensual sex within 72 hours of recovery of the DNA, making such evidence irrelevant and unfairly prejudicial. Petitioner complains that, although Ohio law required the trial court to hold a hearing in chambers three days prior to trial to resolve the admissibility of such evidence, the trial court waited until the first day of trial to hold that the DNA evidence would be admissible. (PageID# 8.) Petitioner asserts that admission of the DNA evidence violated Ohio evidentiary rules. (ECF No. 10, PageID# 849.) He complains that the trial court abused its discretion. (PageID# 855.) According to Petitioner, admission of DNA evidence denied him due process and his right to equal protection and constituted an arbitrary and unreasonable enforcement of Ohio's rape shield law. (PageID# 858.)

The state appellate court rejected Petitioner's claim as follows:

> [A]ppellant contends the trial court erred in admitting DNA evidence because the evidence was both irrelevant and prejudicial. Specifically, appellant asserts that, because F.C. admitted to having consensual sexual conduct within 72 hours of the alleged sexual assaults, the DNA evidence is inadmissible since "[t]here is no way to prove that the D.N.A. found [on] the victim came from the alleged sexual assault." (Supplemental Brief, 2.)
>
> To be relevant and therefore admissible, evidence must have a tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. *See also Oakwood v. Makar*, 11 Ohio App.3d 46, 50 (8th Dist. 1983). Even if the evidence is relevant, it must be excluded under Evid.R. 403(A) "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." However, despite the mandatory terms of Evid. R. 403(A), the appropriate standard of review is the abuse of discretion standard. The Supreme Court of Ohio has interpreted Evid.R. 403(A) to mean that "'[t]he trial court has broad discretion

in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere.'" *Maurer* at 265, quoting *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967).

In the case *sub judice*, appellant asked the trial court to find the seminal fluid and DNA evidence inadmissible as irrelevant and prejudicial. However, as the trial court explained, "it's a matter of truth and veracity whether the act occurred. The semen would be there anyway from the previous act. * * * So, you know, I don't see where you're prejudiced in any way, okay? I'll overrule that." (Tr. 42.)

We cannot say the presence of appellant's seminal fluid observed in the testing of F.C.'s vaginal and anal samples is irrelevant as it is consistent with F.C.'s testimony that appellant attempted anal intercourse and successfully performed vaginal intercourse with ejaculation. While the seminal fluid could have been the result of consensual sexual conduct with appellant that occurred either the morning or [] day prior to the alleged sexual assaults, there was testimony to this effect, and we fail to perceive an abuse of discretion or any prejudice resulting from admission of the DNA evidence.

Appellant's argument is more aptly categorized as a challenge to the weight of the evidence rather than to evidence admissibility. *See State v. Pierce*, 64 Ohio St.3d 490 (1992) (questions regarding reliability of DNA evidence in a given case go to the weight of the evidence rather than to its admissibility); *State v. Breeze*, 10th Dist. No. 92AP-258 (Nov. 24, 1992) (argument that DNA evidence being used to exclude sources of blood rather than to include them went to the weight of the evidence, not to its admissibility based on relevance). There was testimony from Detective Bobbitt, Main, and Smith indicating that, though appellant's seminal fluid and DNA were observed in the vaginal and anal samples of F.C., the tests could not determine how or when the DNA came to be there or whether it was the result of consensual sexual conduct or a forced sexual assault as alleged by F.C. Whether or not the alleged sexual assaults occurred throughout the evening hours of January 5, 2013 was one of the issues the jury was tasked with determining. While appellant denied any sexual conduct during this time, F.C. described three instances of unwanted sexual conduct. As discussed in our disposition of appellant's second assignment of error, a conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution's testimony. *Anderson*.

> Upon review, we find no error in the admission of the DNA evidence[.]

(ECF No. 9-1, PageID# 81-82.)

To the extent Petitioner's claim implicates the alleged violation of state evidentiary rules, or state law, it fails to present an issue warranting federal habeas corpus relief. 28 U.S.C. § 2254(a). As a general matter, errors of state law, especially the improper admission of evidence, do not provide grounds for habeas corpus relief. *Estelle v. McGuire*, 502 U.S. 62 (1991); *Giles v. Schotten*, 449 F.3d 698, 704 (6th Cir. 2006). To be entitled to habeas relief, a petitioner must demonstrate that an evidentiary ruling violated more than a state rule of evidence or procedure. In order to prevail, a petitioner must show that the evidentiary ruling was "so egregious that it resulted in a denial of fundamental fairness." *Giles*, 449 F.3d at 704 (citing *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004)). Stated differently, "'[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.'" *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2006) (citing *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir. 2002)). A state court evidentiary ruling does not violate due process unless it "offend[s] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Giles*, 449 F.3d at 704 (citing *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001)). For the reasons discussed by the state appellate court, the record fails to reflect such circumstances here.

Petitioner argues that admission of DNA evidence was constitutionally prohibited, because it constituted unduly suggestive and unreliable identification evidence of guilt. *See Supplementary Argument to Ground One* (ECF No. 14.) Referring to *McDaniel v. Brown*, 558

U.S. 120, 135 (2010) (raising same argument), Petitioner argues that the state appellate court's decision contravened *Manson v. Brathwaite*, 432 U.S. 98 (1977).  Petitioner also refers, *inter alia*, to *Carey v. Musladin*, 549 U.S. 70 (2006) (the wearing of buttons displaying the victim's image by victim's family during trial did not deprive defendant of constitutionally fair trial), *Colorado v. Connelly,* 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."), *Lisenba v. People of State of California*, 314 U.S. 219, 236 (1941) (regarding whether due process was violated by admission of defendant's allegedly coerced confession), and  *United States v. Lovasco*, 431 U.S. 783 (1977) (applying the Sixth Amendment right to a speedy trial based on pre-indictment delay), in support of his claim.  (PageID# 901.)   However, Petitioner failed to exhaust this issue because he never raised a federal constitutional claim in the Ohio Court of Appeals.

In order to satisfy the exhaustion requirement in habeas corpus, a petitioner must fairly present the substance of each constitutional claim to the state courts as a federal constitutional claim.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Although the fair presentment requirement is a rule of comity, not jurisdiction, *see Castille v. Peoples*, 489 U.S. 346, 349 (1989); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999), it is rooted in principles of comity and federalism designed to allow state courts the opportunity to correct the State's alleged violation of a federal constitutional right that threatens to invalidate a state criminal judgment. In the Sixth Circuit, a petitioner can satisfy the fair presentment requirement in any one of four ways: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a

specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Further, general allegations of the denial of a constitutional right, such as the right to a fair trial or to due process, are insufficient to satisfy the "fair presentment" requirement. *Id*.

Here, Petitioner argued generally that the trial court's ruling denied him equal protection and due process. In support of this argument, however, he referred solely to state evidentiary rules and state law. (See ECF No. 9-1, PageID# 193-95; 228.) He did not refer to any federal or state cases relying on federal law that would have alerted the state appellate court to the nature of an argument under *Manson v. Brathwaite*, or the Equal Protection Clause. Further, he has failed to establish cause for his failure to present such federal claim to the state courts. To the extent that Petitioner attempts to present an issue of federal constitutional magnitude, he has thereby waived this claim for federal habeas corpus review.

### Claim Two

In claim two, Petitioner asserts that the trial court violated his right to "grand jury findings" and to indictment by a grand jury due to the amendment of the indictment to delete repeat violent offender specifications from Counts 7 and 8, which charged him with abduction and domestic violence, based on an apparent typographical error. (PageID# 11; ECF No. 10, PageID# 863.) Petitioner claims that the trial court thereby denied him due process and violated Rule 7(D) of the Ohio Rules of Criminal Procedure, constituting "structural error." (ECF No. 10, PageID# 860, 865.) According to Petitioner, he thereby was denied adequate notice of the charges against him. (PageID# 866.)

> The state appellate court rejected Petitioner's claim as follows:
>
> > [A]ppellant contends the trial court erred when it granted the prosecution's request to amend the indictment to remove the RVO

specification from Count 7 charging abduction and Count 8 charging domestic violence.

The transcript indicates that, prior to trial, the prosecutor noted the indictment contained a typographical error as it mistakenly included the RVO specification language on the charges for abduction and domestic violence. Therefore, the prosecutor asked that such language be deleted. Appellant's counsel indicated there was no objection to the deletion of the specifications from Counts 7 and 8. At the beginning of the sentencing hearing, appellant's counsel stated that appellant believed the amendment to the indictment was improper because the amendment changed the name and identity of the offenses charged. The trial court rejected appellant's argument and proceeded to sentencing.

Pursuant to Crim.R. 7(D), a court may, before, during or after a trial, amend an indictment due to any variance with the evidence, provided no change is made in the name or identity of the crime charged. A trial court's decision to permit the amendment of an indictment is reviewed under an abuse–of-discretion standard. *State v. Smith,* 10th Dist. No. 03AP-1157, 2004-Ohio-4786, ¶ 10. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore* at 219. Furthermore, when the name or identity of the crime charged is not changed by the amendment, a defendant on appeal must show that the amendment prejudiced his defense for there to be reversible error. *Smith* at ¶ 10.

In appellant's case, the indictment was amended to delete the RVO specification language from Counts 7 and 8 of the indictment. Count 7 charged appellant with abduction as a third-degree felony, and Count 8 charged appellant with domestic violence as a first-degree misdemeanor. Though appellant argues to the contrary, neither the name nor identity of the crimes charged, *i.e*., third-degree felony abduction and first-degree misdemeanor domestic violence, were changed as a result of deleting the RVO specification language.

Because the name and identity of the crimes charged were not changed by the amendment, in accordance with *Smith*, appellant must show that the amendment prejudiced his defense. This appellant has failed to do. Removal of the RVO specifications from counts 7 and 8 actually benefitted appellant. Moreover, because the RVO specification remained as to other counts in the indictment, appellant has not argued the amendment in any way

15

> prejudiced his ability to defend the charges against him.  Finally, to the extent appellant asserts in this assigned error that the amendment interfered with the "Grand Jury's intent when it handed down the R.V.O[.] specification on count 7," we find no merit to said assertion.  (Supplemental Brief, 4.)

(ECF No. 9-1, PageID# 82-83.)

Again, to the extent that Petitioner raises a claim regarding the alleged violation of state law or evidentiary rules, such claim fails to provide a basis for federal habeas corpus relief. Further, "[i]t is well settled that the federal guarantee of a grand jury indictment does not apply to the states." *Segines v. Tibbals*, 2012 WL 5471802, at *9 (N.D. Ohio Sept. 13, 2012) (citing *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984) (internal citation omitted)).

> Although the State of Ohio may require indictment by a grand jury pursuant to its own constitution, any violation of such right is a matter of state law.  The U.S. Supreme Court has stated many times that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *see also Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). To be entitled to relief in federal habeas corpus, a petitioner must establish that there has been an infringement of a right guaranteed under the United States Constitution. *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir.1994).
>
> Therefore, even if Ohio requires indictment by a grand jury similar to the federal constitutional right in federal criminal prosecutions, the violation of the state right to a grand jury indictment in Ohio, and all the procedural safeguards appurtenant thereto, does not transform the state right into a federal constitutional right.

*Id*.

Procedural due process requires that the indictment: "(1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy." *Joseph v. Coyle*, 469 F.3d 441, 463 (6th Cir. 2006) (quoting *Valentine v. Konteh*, 395 F.3d 626, 631 (6th Cir. 2005)); *see also Cole v. Arkansas*, 333 U.S.

196, 20 (1948). The law is clear that "[b]eyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review." *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002) (citing *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986)). The Constitution only requires that whatever charging method a state employs, the state must give a defendant fair notice of the charges to permit adequate preparation of his defense, so "that the offense be described with some precision and certainty so as to apprise the accused of the crime with which he stands charged." *Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988). Here, the indictment provided Petitioner fair notice of the charge against him which was sufficient to enable him adequately to prepare a defense. The undersigned rejects Petitioner's contention that correcting a typographical error violated the Constitution.

**Recommended Disposition**

Therefore, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

**Procedure on Objections**

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b) (1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report*

*and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

                                                   s/ *Elizabeth A. Preston Deavers*
                                                   Elizabeth A. Preston Deavers
Date:  September 6, 2016                United States Magistrate Judge